MARC E. HANKIN (SBN: 170505)
E-Mail: Marc@hpl.law
ANOOJ PATEL (SBN: 300297)
E-Mail: Anooj@hpl.law
**HANKIN PATENT LAW, APC**
11414 Thurston Cir.
Los Angeles, CA 90049
Telephone: (310) 979-3600

Attorneys for PLAINTIFF,
**MMAS RESEARCH LLC**

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MMAS RESEARCH LLC, a Washington limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>MICHIGAN STATE UNIVERSITY; ADESUWA OLOMU, M.D., in her official capacity as Responsible Party for ClinicalTrials.gov Study NCT04874116; BETSI CADWALADR UNIVERSITY HEALTH BOARD; DOES 1 through 10, inclusive,<br><br>Defendants. | Case No. 2:26-cv-10236<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>**1. Breach of Contract**<br>**2. Misappropriation of Trade Secrets under the Defend Trade Secrets Act (DTSA) and State Law**<br>**3. 17 U.S.C. § 501 – Infringement of Copyright**<br>**4. 17 U.S.C. § 1202 – Falsification and Removal of Copyright Management Information**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff MMAS RESEARCH LLC ("MMAS Research" or "Plaintiff"), for its causes of action against Defendants Michigan State University ("MSU"), Adesuwa Olomu, M.D., in her official capacity ("Dr. Olomu"), Betsi Cadwaladr University Health Board ("BCUHB"), and DOES 1 through 10 (collectively, "Defendants"), alleges as follows:

## JURISDICTION AND VENUE

1. This action arises in part under the Copyright Act, 17 U.S.C. § 101 et seq., including 17 U.S.C. §§ 501 and 1202. This Court has original and exclusive jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

2. This action also arises under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 et seq., conferring federal question jurisdiction under 28 U.S.C. § 1331. The trade secrets at issue are used in and intended for use in interstate and foreign commerce within the meaning of 18 U.S.C. § 1836(b)(1).

3. This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367(a), and diversity jurisdiction under 28 U.S.C. § 1332(a)(2) and (a)(3), the amount in controversy exceeding $75,000 exclusive of interest and costs.

4. This Court has personal jurisdiction over MSU by consent. In the written license agreement described below, MSU agreed that the agreement and all matters connected with its performance would be construed and governed in accordance with the laws of California and of the United States, and further agreed "that all disputes and litigation regarding this Agreement, its construction and matters connected with its performance shall be subject to the jurisdiction of the Courts of Los Angeles California." MSU further directed communications, a purchase order, and payment into California, and received licensed software, training, and certification from a California-based licensor.

5. Dr. Olomu is sued solely in her official capacity as the Responsible Party of record for ClinicalTrials.gov Study NCT04874116, and solely for prospective injunctive relief with respect to the continuing publication described below. Plaintiff seeks no damages, and no retrospective relief of any kind, from Dr. Olomu. Relief of that character against a state official in her official capacity is available under Ex parte Young, 209 U.S. 123 (1908).

6. This Court has personal jurisdiction over BCUHB because BCUHB, through its employee and the corresponding author of the publication at issue, purposefully directed its conduct at the United States and at this forum: it submitted the manuscript at issue to a journal published in the United States; it caused the article, including a verbatim reproduction of the instrument bearing a false license

notice, to be published, distributed, and indexed in the United States, including on the PubMed Central repository maintained by the National Institutes of Health. Jurisdiction is also proper under Fed. R. Civ. P. 4(k)(2).

7. Venue is proper under 28 U.S.C. § 1391(b)(2), (c)(3), and (d), and independently as to MSU under the forum selection provision of the parties' written license agreement.

## THE PARTIES

8. Plaintiff MMAS Research LLC is a Washington limited liability company with its principal place of business at 101 2nd St., Petaluma, California 94952.

9. Plaintiff is the owner of the "MMAS RESEARCH WIDGET CODE" (the "Morisky Widget"), registered with the United States Copyright Office under Registration No. TX 8-816-517, registration date December 3, 2019.

10. Plaintiff is also the owner of the Global Medication Reconciliation Form (the "GMRF"), a medication reconciliation instrument licensed by Plaintiff together with the Morisky Widget.

11. On information and belief, Defendant Michigan State University is a public university of the State of Michigan with offices at 426 Auditorium Road, East Lansing, Michigan 48824.

12. On information and belief, Defendant Adesuwa Olomu, M.D., is a professor of medicine at MSU, the Director of the Office-GAP IMPACT Program, and the Responsible Party of record for ClinicalTrials.gov Study NCT04874116. She is named solely in her official capacity and solely for prospective relief.

13. On information and belief, Defendant Betsi Cadwaladr University Health Board is a National Health Service health board organized under the laws of Wales, United Kingdom, with offices at Ysbyty Gwynedd, Penrhosgarnedd, Bangor, Gwynedd LL57 2PW, Wales.

14. The true names and capacities of DOES 1 through 10 are unknown to Plaintiff, which sues them by fictitious names and will seek leave to amend when

their identities are determined.

## FACTS COMMON TO ALL CLAIMS

### A. The Morisky Widget, the GMRF, and Plaintiff's Ownership

15. In or about December 2016, Donald Morisky and Steven Trubow formed MMAS Research LLC in the State of Washington, owned equally by them, to develop a software work derived from the Morisky Medication Adherence Scales.

16. Morisky and Trubow jointly created that new work, the Morisky Widget. Morisky contributed the paper scales; Trubow contributed predictive analytic risk assessment software. A true and correct copy of email correspondence between Steven Trubow, Donald Morisky and Dustin Machi concerning the creation of the Morisky Widget has been filed concurrently herewith as Exhibit 1.

17. By email dated June 21, 2019, Donald Morisky accepted an offer of withdrawal and wrote: "I hereby withdraw as a member and from all other of my roles on behalf of MMAS Research, LLC, effective June 21, 2019." The offer he accepted was that on withdrawal he would give up his fifty percent ownership in the Morisky Widget. A true and correct copy of that email has been filed concurrently herewith as Exhibit 2.

18. In a Memorandum dated March 13, 2024, in Case No. 23-55202, the United States Court of Appeals for the Ninth Circuit held that a 2020 preliminary settlement agreement was never finalized, that "MMAS thus never transferred its copyright and remains the registered owner of the Morisky Widget." A true and correct copy of that Memorandum has been filed concurrently herewith as Exhibit 3.

19. The Morisky Widget is software. It is not a questionnaire and it is not a printed form. It administers, scores, and codes medication adherence assessments and returns its results through a software interface.

20. The Morisky Widget does not produce a single adherence number. For each assessment it produces three concurrent scores: raw adherence, intentional non-

adherence, and unintentional non-adherence.

21. The Morisky Widget includes a test editor that converts static, generic items into items specific to a named medication or a named health condition, in more than eighty languages, in near real time.

22. Scored correctly, the eighth item of the eight-item instrument is a five-point item contributing in quarter-point increments. Correct scoring therefore produces non-integer totals, including 7.75, 7.50, 7.25, 6.75, 6.50, and 6.25.

23. The GMRF is a distinct licensed product. It is a medication reconciliation instrument that resolves a patient's regimen drug by drug, rather than treating "medication" as a single undifferentiated category.

**B. The Instrument's Own Mandatory Substitution Requirement**

24. The printed eight-item instrument, in the version bearing the notice "Morisky Medication Adherence Scale™ (8-Item MMAS™ Instrument), Copyright 2006 Donald E. Morisky. All rights reserved," carries the following instruction:

> "Note: This is a generic adherence scale and the name of the <health condition> (such as 'high blood pressure') should be substituted in each question ('item')." A true and correct copy of that instrument has been filed concurrently herewith as Exhibit 15.

25. The same printed instrument carries <health condition> placeholders in its instruction paragraph and in six of its eight items. See Exhibit 15.

26. The printed instrument states that requirement and supplies no mechanism by which it can be performed. It cannot substitute a condition or a medication into its own items, it cannot render itself in another language, and it cannot decompose a response set into intentional and unintentional non-adherence. See Exhibit 15.

27. The Morisky Widget is that mechanism. Its condition and medication token architecture, its per-condition rendering layer, and its translation editor exist to execute the substitution the printed instrument requires but cannot perform.

28. An assessment administered generically, without substituting the patient's

health condition or medication into each item, therefore departs from the express written instruction of the instrument itself, and cannot attribute non-adherence to any particular medication.

**C. The 2008 Validation and Its Retraction**

29. The diagnostic claims for the printed instrument rested principally on Morisky DE, Ang A, Krousel-Wood M, Ward HJ, "Predictive Validity of a Medication Adherence Measure in an Outpatient Setting," J Clin Hypertens 2008;10(5):348–354.

30. In 2022, an independent reconstruction of that study's own patient-level data — Ortiz MS, J Clin Hypertens 2022;24:1390–1391 — recomputed the instrument's real-world sensitivity at approximately 38 percent (95% CI 34–41), specificity at 75 percent, and accuracy at 53 percent, against published claims of 93 percent, 53 percent, and 80 percent. The calculations were independently verified. A true and correct copy of that Letter to the Editor has been filed concurrently herewith as Exhibit 4.

31. A 2017 pooled analysis, Moon SJ et al., PLoS One 2017;12(11):e0187139, on which Donald Morisky is the fourth author, reported pooled sensitivity of 43 percent and specificity of 73 percent.

32. On August 18, 2023, the Journal of Clinical Hypertension retracted the 2008 validation article. Retraction Statement, J Clin Hypertens 2023;25(9):889, DOI 10.1111/jch.14718. The journal separately published a Notification, DOI 10.1111/jch.14712, stating that following independent statistical review it no longer had confidence in the reported conclusions. A true and correct copy of the retraction notice has been filed concurrently herewith as Exhibit 5.

33. At a sensitivity of approximately 38 percent, of every 100 truly non-adherent patients assessed on the flat printed instrument, approximately 62 are recorded as adherent.

**D. The MSU Perpetual License**

34. Effective September 8, 2020, MSU and Plaintiff entered into a written agreement titled “Perpetual MMAS Research Widget Software License” (the “MSU License”). A true and correct copy of the MSU License has been filed concurrently herewith as Exhibit 6.

35. On December 11, 2020, Patrick Clifford of MSU wrote to Plaintiff confirming that a purchase order had issued to pay for the license and that once it was received the parties could proceed with training and delivery of the software. A true and correct copy of that email has been filed concurrently herewith as Exhibit 8.

36. On December 14, 2020, Plaintiff submitted invoice number 2197 to MSU, referencing Purchase Order No. 578691. The invoice states that the one-time lump sum of $6,500 is “for a perpetual MMAS Widget and Global Medication Reconciliation Form Software Licenses which includes five (5) hours of gotomeeting training and certification.” A true and correct copy of invoice number 2197 has been filed concurrently herewith as Exhibit 9.

37. MSU paid $6,500 to Plaintiff. MSU’s own project manager later confirmed in writing that MSU “had to pay with Grant Funds – $6,500,” and referred to “the purchase of the Widget and training.” See Exhibit 10. A true and correct copy of correspondence in which MSU's Assistant General Counsel confirms that payment in writing has been filed concurrently herewith as Exhibit 17.

38. MSU accepted the benefits of the MSU License, including delivery of training and certification in March 2021, and is bound by its terms.

39. The consideration MSU paid therefore purchased two licensed products: the Morisky Widget and the GMRF. On information and belief, MSU used neither.

40. The MSU License contains a mandatory scoring covenant: “All MMAS Widget Software tests must be scored and coded, without exception, through the Morisky Widget Software or API.” See Exhibit 6.

41. The MSU License restricts users: the licensed software may be used only

by MSU faculty, staff, or students who have been trained and certified by the Licensor on the Widget Software and on "the Morisky Widget Medication Adherence and Medication Reconciliation Protocols." See Exhibit 6.

42. The MSU License contains a confidentiality and trade secret covenant: the Licensor's Widget Software coding and scoring criteria are trade secrets of the Licensor, and "Licensee is forbidden from publicizing MMAS Coding and Scoring criteria in any form without the expressed, written consent from Licensor." That covenant expressly survives termination. See Exhibit 6.

43. The MSU License reserves to the Licensor the right to withdraw permission for use and to pursue all legal remedies upon a determination of scientific, administrative, or intellectual property misconduct, and is governed by California law with disputes subject to the courts of Los Angeles, California. See Exhibit 6.

44. Before the MSU License was signed, Plaintiff told MSU in writing why the Widget exists. On September 9, 2020, Plaintiff wrote to Patrick Clifford that the progression from the printed instrument to the Widget was driven by the low sensitivity and specificity of the generic printed instrument; that "the Morisky Widget MMAS-8 has different scoring and coding"; that the printed instrument measured only the level of adherence while the Widget also identifies why the patient is not taking the medication; and that it is not possible to modify the printed instrument for changes in medication, dosage, or frequency. A true and correct copy of that email has been filed concurrently herewith as Exhibit 7.

45. MSU therefore contracted with actual, written knowledge that the printed instrument and the Widget are scored differently, that the difference is medication-specificity, and that the difference is the reason for the license.

**E. Training and Certification, Including at Sparrow Hospital**

46. In March 2021, Plaintiff delivered training and certification to MSU clinicians on the Morisky Widget and on its scoring and coding.

47. As part of that program, twelve clinicians at Sparrow Hospital — the hospital affiliated with MSU and identified on the face of the publication described in Section H below — were trained and certified on the Morisky Widget scoring and coding.

48. Amey Joshi was not among the clinicians trained and certified by Plaintiff.

49. The validated method was therefore under contract to MSU, delivered on site at the hospital where Dr. Joshi practiced, and taught to twelve of her colleagues, in the period preceding that publication.

**<u>F. MSU's Use of the Printed Instrument Outside the Widget</u>**

50. On April 23, 2021, Mary Ann Kozak, Project Manager, Office-GAP, Department of Medicine, MSU, wrote to Plaintiff, copying Patrick Clifford:

> "Since we are not using the Widget and only using the MMAS-8, is there any credit that we can have on the purchase of the Widget and training?" A true and correct copy of that email chain has been filed concurrently herewith as Exhibit 10.

51. That writing is MSU's own admission that it was administering the printed instrument and was not scoring or coding through the Morisky Widget, in direct contravention of the mandatory scoring covenant. It makes no reference to the GMRF at all.

52. On information and belief, no assessment administered by or on behalf of MSU after the effective date of the MSU License was scored and coded through the Morisky Widget.

**<u>G. The NCT04874116 Trial, the Office-GAP Intervention, and the Registry Publication</u>**

53. MSU is the Sponsor of the clinical trial registered on ClinicalTrials.gov under National Clinical Trial identifier NCT04874116, titled "Decreasing Cardiovascular Risk for Patients With Diabetes." A true and correct copy of the registry record for NCT04874116, as captured on August 4, 2026, has been filed

concurrently herewith as Exhibit 11.

54. Dr. Olomu is identified in the registry record as the Responsible Party. She is the person with authority to submit and amend that record.

55. The trial is funded by the National Heart, Lung, and Blood Institute of the National Institutes of Health under award R01 HL149777.

56. The registry record identifies the study type as Interventional, with an estimated enrollment of 378 patients, across 17 teams in 12 Federally Qualified Health Centers in Michigan, among patients with type 2 diabetes and elevated glycated hemoglobin. See Exhibit 11.

57. The registry record states an actual study start date of May 26, 2021, and an estimated primary completion date and study completion date of September 30, 2026. The trial remains active as of the filing of this Complaint. See Exhibit 11.

58. The registered design provides that all patients receive usual care and medication; that eight teams use a mobile health support platform alone; that nine teams combine that platform with the Office-GAP intervention; and that the investigators will evaluate the impact of shared decision-making strategies for patients and providers. See Exhibit 11.

59. Office-GAP, which stands for Office-Guidelines Applied to Practice, is a shared decision-making program developed at the MSU College of Human Medicine and directed by Dr. Olomu.

60. On MSU's own published description, the central in-consultation component of Office-GAP is a one-page checklist that lists the evidence-based medications for cardiovascular disease prevention in diabetic patients, used to guide real-time discussion between patient and physician. See Exhibit 11.

61. The Office-GAP intervention therefore operates medication by medication. Its mechanism is a structured, drug-by-drug reconciliation of the patient's regimen in the clinical encounter.

62. The GMRF that MSU licensed and paid for is an instrument of precisely

that character, and the training MSU purchased expressly covered the Medication Reconciliation Protocols. On information and belief, MSU has not used the GMRF in this trial or in any other.

63. The second component of the registered intervention is a text messaging platform. The registry record describes the project objective as evaluating "a patient activation program: Office Guidelines Applied to Practice (Office-GAP) combined with mobile text messaging reinforcement (Way to Health [W2H]) on medication adherence in patients with DM compared to mobile texting alone." Both arms of the trial receive the Way to Health platform; only one receives Office-GAP. See Exhibit 11.

64. The registry record describes the platform's operation in detail. It states that "The Way to Health service does not require patients to use a special app," and that the platform engages patients in two ways: participants "receive daily Way to Health messages appropriate to their diagnosis and medications (e.g. BP, blood glucose, medication) and appointment reminders throughout the study," and participants "respond to prompts, and may contact their providers' office throughout the study via texting." See Exhibit 11.

65. The registry record states the platform's purpose in terms of adherence: "The Way to Health texting program will be used to encourage T2DM patients to maintain communication with their providers, improve medication adherence, and other secondary prevention and self-care between visits." See Exhibit 11.

66. The registry record gives, as an example of the messages sent, the following: "Sample message texts include 'Did you take your medications today?'" That is an adherence question. It is put to every participant in both arms, daily, and the participant's answer is captured by the platform. It does not appear among the registered outcome measures. See Exhibit 11.

67. The registry record further states that at the group visit participants "learn to use Way to Health Texting service and confirm set up on their mobile phone,"

and that "[b]oth groups will also complete baseline study questionnaires during the group visit." See Exhibit 11.

68. The registry record lists three co-primary adherence outcome measures: an electronic monitoring measure; the Adherence to Refills and Medications Scale; and, as Primary Outcome Measure 3, the following:

> "Change in Medication Adherence — Morisky Scale (MMAS-8). Four Yes-No items and each is scored as 1 or 2 to create a composite measure that ranges from 4 to 8 points. Higher scores indicate better adherence. [Time Frame: Progression of adherence over 12 months]"
>
> See Exhibit 11.

69. That published specification describes no existing instrument. The eight-item Morisky instrument does not consist of four items, its items are not scored as 1 or 2, and its range is not 4 to 8.

70. Nor does it describe the four-item Morisky Green Levine scale published in 1986. On that published scale an affirmative answer marks the non-adherent behavior, so that higher scores indicate worse adherence, not better. The registry specification states the opposite.

71. The published specification is therefore a hybrid that matches no version of either instrument and that inverts the direction of scoring. On information and belief, it did not derive from any public source.

72. A clinician who applies the published specification to a four-item instrument obtains a result in which the patient with the greatest adherence problem is recorded as the most adherent.

73. On June 17, 2021, Plaintiff gave MSU written notice, addressed to Patrick Clifford, DOM Accountant in the Department of Medicine at MSU and copied to Dr. Olomu, identifying "the publishing of an incorrect MMAS-8 scoring and coding criteria on the clinicaltrials.gov website," linking the registry record, and quoting the published text. A true and correct copy of that notice, together with the

correspondence that followed it, has been filed concurrently herewith as Exhibit 14.

74. The same day, Dr. Olomu forwarded that notice internally and wrote: “Can you check on the error and see how we can correct this if any?” MSU thereby acknowledged the error contemporaneously and in writing. See Exhibit 14.

75. On July 26, 2021, counsel for MSU wrote to Plaintiff’s then-counsel: “I don’t think negotiations were finalized, but MSU did pay the $6,500.00 to use the software and for the software training.” The same day, Plaintiff’s then-counsel advised MSU in writing that the training and certification on the Morisky Widget software had never been completed, that the license forbids publication of any scoring and coding without Plaintiff’s consent, and that the specification published on ClinicalTrials.gov did so and did so incorrectly, and that Plaintiff withdrew permission to use the Morisky Widget Software. On August 30, 2021, counsel for MSU replied: “I have talked this over with the MSU PIs involved and we have decided that a self-report measure of medication-taking behavior is not necessary for this study. Therefore, MSU won’t be using the MMAS-8 scale at all on this project.” See Exhibit 17.

76. The published protocol for the trial, Olomu A et al., Trials 2022;23:659, does not identify the eight-item Morisky instrument as an outcome measure at all. It identifies two adherence measures, not three. A true and correct copy of the published protocol has been filed concurrently herewith as Exhibit 18.

77. A record on ClinicalTrials.gov is not passively hosted. Each version of a study record is created by an affirmative submission made by or on behalf of the Responsible Party, and each submission is separately dated and separately archived by the registry.

78. The registry record for NCT04874116 has been amended and resubmitted repeatedly since June 17, 2021, and its last update was posted on September 16, 2025. On information and belief, the specification quoted above was contained in each version submitted after August 2023, including the version submitted in 2025.

A true and correct copy of the Record History tab and Study Record Versions for NCT04874116, as captured on August 4, 2026, has been filed concurrently herewith as Exhibit 13.

79. Each such submission was a separate act of publication of a specification of the licensed instrument's scoring and coding, made without Plaintiff's written consent, after written notice, and after MSU represented that it would not use the instrument at all.

80. The registered endpoint cannot measure what the registered intervention does. Office-GAP operates drug by drug. The instrument as specified returns a single aggregate score for medication in the abstract and, administered without substitution of a named condition or medication, cannot attribute non-adherence to any particular drug.

81. Nor can the endpoint detect change. The trial measures change in adherence over twelve months. An instrument whose real-world sensitivity has been reconstructed at approximately 38 percent cannot reliably distinguish a change produced by the intervention from measurement error.

82. Plaintiff alleges in the alternative, pursuant to Fed. R. Civ. P. 8(d)(2) and (3), as follows. If MSU administered assessments on the eight-item instrument to participants in NCT04874116 at baseline or at any follow-up interval, then MSU breached the mandatory scoring covenant as to each such assessment, and used Plaintiff's scoring and coding criteria outside the scope of the MSU License.

83. In the alternative, if MSU did not administer such assessments, then MSU and Dr. Olomu published, and have continued for more than five years to publish, on a federal clinical trials registry, a co-primary outcome measure of an interventional trial that MSU was not collecting — and did so after written notice that the specification was incorrect.

84. Which of those alternatives is true is a matter peculiarly within Defendants' knowledge and control. The facts that would resolve it are held by MSU

and are not available to Plaintiff.

85. Plaintiff further alleges, on information and belief, that some form of the Morisky Medication Adherence Scale was delivered to participants in NCT04874116 through the Way to Health platform, and that responses so collected were scored and coded outside the Morisky Widget. The basis for that belief is the registry record itself: the platform is described as sending daily messages keyed to the participant's medications, as capturing participant responses to prompts, as existing for the stated purpose of improving medication adherence, and as sending, by way of example, the question "Did you take your medications today?" The platform is a survey and messaging system, the trial's registered outcome is change in medication adherence, and the instrument named in Primary Outcome Measure 3 is an eight-item questionnaire.

86. If that is what occurred, then every such delivery was an administration of the licensed instrument outside the Morisky Widget, in breach of the covenant that all tests be scored and coded, without exception, through the Morisky Widget Software or API, and each such response set was scored and coded by a method Plaintiff has never seen and never approved.

87. Plaintiff does not presently know which system administered, stored, scored or coded each of the adherence measures in this trial. That is precisely the information Defendants hold and Plaintiff does not.

88. Those facts are contained in, among other things: the REDCap data dictionary and case report forms for NCT04874116; the data extracts and adherence variable definitions maintained by the MSU Biomedical Research Informatics Core; the Way to Health survey configuration, message library, response logs and any scoring or coding logic applied to responses collected through that platform; the records identifying which system administered, stored, scored and coded each adherence measure in this trial and on what schedule; the ClinicalTrials.gov Protocol Registration and Results System account submission log for the study; the study's

institutional review board file, including continuing review records and protocol modifications; the Office-GAP checklist and shared decision-making materials; and the correspondence of MSU's counsel in August 2021.

89. Dr. Olomu, as Responsible Party, presently has the authority and the practical ability to amend the registry record and remove or correct the specification. She has not done so.

90. The publication is continuing. It will continue until corrected, and the trial's primary completion date of September 30, 2026 will fix the data against the registered outcome measures as they then stand.

## H. The Cureus Article — MSU and BCUHB

91. On September 20, 2024, Cureus published Agarwal A, Mannagudda Sandip S, Joshi A, Ashok A, "The Patterns of Non-adherence to Medication in the Management of Cardiovascular Disease: A Descriptive Study," Cureus 2024;16(9):e69810 (the "Accused Article"). A true and correct copy of the Accused Article, as originally published, has been filed concurrently herewith as Exhibit 12.

92. Anurag Agarwal is the corresponding author and is identified on the face of the Accused Article with General Surgery, Betsi Cadwaladr University Health Board, Bangor, United Kingdom.

93. Amey Joshi is identified on the face of the Accused Article with Internal Medicine, Sparrow Hospital – Michigan State University, East Lansing, United States, and is credited in every listed author role, including supervision.

94. The underlying data collection was conducted in India under an institutional ethics committee approval of the Vydehi Institute of Medical Sciences and Research Centre. Plaintiff does not allege that either MSU or BCUHB sponsored or had regulatory oversight of the Indian site.

95. The Accused Article reported adherence results for 203 cardiovascular disease patients.

96. The Methods of the Accused Article state that adherence was measured

using the eight-item Morisky instrument; that scores were summated on a range of 0 to 8; that adherence levels were categorized as high at 8 points, medium at 6 or 7 points, and low at below 6; and that the sensitivity and specificity of the eight item scale are 93 percent and 53 percent.

97. The Methods further state that the scoring criteria and cut-points are predetermined. The authors thus represented that they were applying a fixed key established by another.

98. As originally published, the Accused Article reproduced the questionnaire across three figures. The eight-item instrument appears in the third of them, reproduced in full, including its instruction paragraph, the No equals 0 and Yes equals 1 column headings, items one through seven, and the five-point response scale for item eight. See Exhibit 12.

99. Beneath each of those three figures the Accused Article stated that the reproduced material was attributed to Morisky et al. 2008 and was licensed under the terms of the Creative Commons Attribution 4.0 License. See Exhibit 12.

100. That statement was false. The instrument was not, and has never been, available under any Creative Commons license, and its use requires permission.

101. The reproduction also omitted the copyright notice borne by the instrument itself, which reads “Copyright 2006 Donald E. Morisky. All rights reserved,” and omitted the attribution footnote the instrument requires on the first table or figure presenting it. See Exhibit 15.

102. The instrument as reproduced was administered without substitution. The instruction paragraph retained the bracketed placeholder, and items one, two, four, five and six each retained the bracketed placeholder, in a study of cardiovascular disease patients.

103. The instruction block as reproduced also contains a sentence stating that interviewers may self-identify regarding difficulties they may experience concerning medication-taking behavior. That sentence is not part of the instrument’s

patient instruction. The instrument was altered.

104. The scoring key as reproduced cannot produce the range the Accused Article reports. Items one through seven are scored zero or one and item eight is scored zero to four, which sums to eleven, not eight. The validated rule divides the eighth item by four, producing quarter increments. No such instruction appears on the reproduced form. See Exhibit 12.

105. The published band definitions cannot be executed as written. Correct scoring produces totals of 7.75, 7.50 and 7.25. The band “medium (6 or 7 points)” holds none of them, and between 7 and 8 the Accused Article defines no band at all.

106. The Accused Article’s own results confirm that the eighth item was collapsed to a binary. Of 203 participants, 154, or 75.9 percent, are reported at exactly 8, and no non-integer value appears anywhere in the article. See Exhibit 12.

107. The consequence is patient-level misclassification. Participants whose correctly scored totals were 7.75, 7.50, or 7.25 — patients in the medium adherence band, that is, patients with a real adherence problem — were recorded as fully adherent.

108. The Accused Article asserts a 93 percent sensitivity in the present tense. That is the figure the independent reconstruction reduced to approximately 38 percent and that the publishing journal withdrew in August 2023, thirteen months before publication.

109. The PubMed Central indexing of the Accused Article carries a “[Retracted]” notation on the 2008 validation in its reference list — a flag appended by PMC, not by the article’s authors. The Limitations section of the same article nonetheless states that the scale has a high sensitivity rate.

110. The reported statistics of the Accused Article do not follow from its own tables. Among other things: one passage reports 42 participants as non-compliant while the adjacent passage reports 49 participants below the high adherence threshold; a chi-square of 3.153 is reported with a p-value of 0.01, where at two

degrees of freedom that statistic corresponds to a p-value of approximately 0.21; the identical chi-square value of 11.439 is reported for two independent cross-tabulations with different p-values; and the columns of one table do not sum to that table's own printed totals.

111. At the time of that conduct, MSU held a perpetual license to the Morisky Widget and the GMRF, had paid for both from federal grant funds, had been told in writing that the Widget is scored differently from the printed instrument, and had twelve clinicians at Dr. Joshi's own hospital trained and certified in the correct method.

**I. The Retraction That Corrected Nothing**

112. On May 29, 2025, the Accused Article was retracted. Cureus 2025;17(5):r184. The retraction was entered at the authors' request on a single ground, the use of a copyrighted scale without the necessary permissions, and the figures depicting the instrument were removed. A true and correct copy of the retraction notice has been filed concurrently herewith as Exhibit 16.

113. The images came down. The method did not. The following remains published and indexed in the Methods of the Accused Article: the summated 0 to 8 range, the band definitions, the statement that the criteria are predetermined, and the assertion that the sensitivity and specificity of the eight item scale are 93 percent and 53 percent. See Exhibit 16.

114. The Methods of the retracted article also continue to direct the reader to figures in an appendix that no longer exists.

115. A reader of the retraction notice learns that a copyrighted instrument was used without permission. That reader does not learn that the reported results rest on a formally retracted instrument, that the article restates a withdrawn sensitivity figure, that the published scoring key cannot be executed as written, or that the reported statistics are facially inconsistent with the article's own tables. See Exhibit 16.

116. Plaintiff has been damaged by each of the acts alleged above.

## FIRST CLAIM FOR RELIEF

## BREACH OF CONTRACT

## (Against Defendant Michigan State University)

117. Plaintiff realleges and incorporates by reference each allegation contained in the preceding paragraphs as if set forth herein.

118. The MSU License is a valid and enforceable contract, accepted and performed on both sides: MSU issued Purchase Order No. 578691, received invoice number 2197, paid $6,500 from grant funds, accepted delivery of training and certification in March 2021, and referred in its own writing to "the purchase of the Widget and training." See Exhibit 17.

119. Plaintiff performed all conditions, covenants and promises required of it, including delivery of the licensed software and of training and certification, or was excused from performance.

120. MSU breached the MSU License by administering the printed instrument and failing to score and code assessments through the Morisky Widget Software or API, in contravention of the covenant that all tests be so scored and coded without exception. MSU admitted this in writing on April 23, 2021.

121. MSU breached the MSU License by publicizing a specification of the licensed instrument's scoring and coding on ClinicalTrials.gov, in any form, without Plaintiff's express written consent, and by resubmitting that specification in successive versions of the registry record.

122. MSU further breached by failing to remove that publication after written notice on June 17, 2021, after its own principal investigator acknowledged the error the same day, after Plaintiff withdrew permission to use the licensed software in July 2021, and after MSU's counsel represented in writing on August 30, 2021 that MSU would not be using the MMAS-8 on this project at all.

123. MSU breached the MSU License by permitting personnel who had not

been trained and certified by Plaintiff to administer and report results of the licensed instrument.

124. On information and belief, MSU further breached the MSU License by delivering some form of the licensed instrument to participants through the Way to Health platform, and by permitting responses so collected to be scored and coded outside the Morisky Widget.

125. MSU failed to receive, and Plaintiff was deprived of the benefit of, the second licensed product for which MSU paid. On information and belief MSU never used the GMRF, notwithstanding that the intervention under study in NCT04874116 is itself a medication reconciliation instrument.

126. The confidentiality and trade secret covenant expressly survives termination of the agreement.

127. As a direct and proximate result, Plaintiff has been damaged in an amount to be proven at trial, including the consideration paid for licensed products whose central covenants were never performed, the diminution in the value of Plaintiff's licensing program caused by the public and uncorrected misstatement of the licensed instrument, and the cost of the corrective work necessary to restore the scientific record.

## SECOND CLAIM FOR RELIEF

## MISAPPROPRIATION OF TRADE SECRETS

## (18 U.S.C. § 1836 et seq.; Cal. Civ. Code § 3426 et seq.)

## (Against MSU, and against Dr. Olomu in her official capacity for prospective injunctive relief only)

128. Plaintiff realleges and incorporates by reference each allegation contained in the preceding paragraphs as if set forth herein.

129. Plaintiff owns and asserts trade secret rights in the following, and in these alone for purposes of this claim: (a) the condition and medication token architecture of the Morisky Widget test editor and the logic by which a generic item is rendered

as a condition-specific or medication-specific item; (b) the algorithm by which a single response set is decomposed into separate intentional and unintentional non-adherence scores; and (c) the architecture of the translation editor by which the foregoing are rendered in more than eighty languages (the "Widget Trade Secrets").

130. For the avoidance of doubt, Plaintiff does not assert as a trade secret in this claim the text of the individual items of the printed instrument, or the flat summation bands appearing on the face of the printed instrument.

131. The Widget Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from their disclosure or use. They are the reason licensees pay for the Morisky Widget rather than administering a printed form.

132. Plaintiff has taken reasonable measures to keep them secret, including written license covenants prohibiting disclosure in any form without express written consent, restriction of access to trained and certified personnel, delivery of the criteria only through training and through the licensed software, and a reserved right of inspection.

133. The Widget Trade Secrets are related to products and services used in and intended for use in interstate and foreign commerce.

134. MSU acquired the Widget Trade Secrets under circumstances giving rise to a duty to maintain their secrecy and limit their use: by written license covenant, and through training and certification delivered by Plaintiff in March 2021.

135. MSU misappropriated the Widget Trade Secrets by disclosing a specification of the licensed instrument's scoring and coding in a public federal clinical trials registry without Plaintiff's consent, and by resubmitting that specification in successive versions of the registry record after written notice, including in versions submitted within three years of the filing of this Complaint.

136. MSU's misappropriation was willful and malicious. MSU received

written notice on June 17, 2021, its principal investigator acknowledged the error the same day, Plaintiff withdrew permission to use the licensed software in July 2021, MSU's counsel represented on August 30, 2021 that MSU would not be using the MMAS-8 at all on this project, and the disclosure nonetheless remains in place.

137. As a direct and proximate result, Plaintiff has suffered actual loss and MSU has been unjustly enriched, in amounts to be proven at trial. Plaintiff is entitled to damages under 18 U.S.C. § 1836(b)(3)(B) and Cal. Civ. Code § 3426.3, to exemplary damages under 18 U.S.C. § 1836(b)(3)(C) and Cal. Civ. Code § 3426.3(c), and to attorneys' fees under 18 U.S.C. § 1836(b)(3)(D) and Cal. Civ. Code § 3426.4.

138. As against Dr. Olomu in her official capacity, and solely under 18 U.S.C. § 1836(b)(3)(A), Plaintiff seeks prospective injunctive relief only. Dr. Olomu is the Responsible Party of record with authority to amend the registry submission. The disclosure is ongoing and will continue absent an order requiring correction. Plaintiff seeks no damages and no retrospective relief from Dr. Olomu.

139. Plaintiff's remedy at law is inadequate as to the continuing publication, and Plaintiff is entitled to injunctive relief under 18 U.S.C. § 1836(b)(3)(A) and Cal. Civ. Code § 3426.2.

## <u>THIRD CLAIM FOR RELIEF</u>

## COPYRIGHT INFRINGEMENT, 17 U.S.C. § 501

## (Against Defendant Betsi Cadwaladr University Health Board)

140. Plaintiff realleges and incorporates by reference each allegation contained in the preceding paragraphs as if set forth herein.

141. Plaintiff is the owner of the Morisky Widget Copyright, Registration No. TX 8-816-517, and has complied in all respects with the Copyright Act.

142. The registered work includes original expression authored by Plaintiff, including the instructional and explanatory text presented to the respondent, the arrangement and sequencing of the assessment, the five-point response architecture

of the eighth item as implemented, and the condition-specific and medication-specific rendering of the assessment.

143. BCUHB, without authorization, reproduced and distributed that protected expression by causing the Accused Article to be published with a verbatim reproduction of the instrument, including its instructional text and its five-point response scale, and by causing that reproduction to be distributed and indexed in the United States.

144. BCUHB had no license from Plaintiff at any time.

145. BCUHB's infringement was willful. The PubMed Central indexing of the Accused Article carried a "[Retracted]" notation on the 2008 validation it cited — a flag added by PMC, not by the article's authors — the article bore no permission statement of any kind, and BCUHB attached to the reproduction a license notice that was false.

146. The infringement occurred after the December 3, 2019 registration date.

147. Plaintiff is entitled to actual damages and any additional profits attributable to the infringement under 17 U.S.C. § 504(b), or in the alternative to statutory damages under 17 U.S.C. § 504(c) of up to $150,000 per work infringed for willful infringement, together with costs and attorneys' fees under 17 U.S.C. § 505, and to injunctive relief under 17 U.S.C. § 502.

## <u>FOURTH CLAIM FOR RELIEF</u>

## FALSIFICATION AND REMOVAL OF COPYRIGHT MANAGEMENT INFORMATION, 17 U.S.C. § 1202

## (Against Defendant Betsi Cadwaladr University Health Board)

148. Plaintiff realleges and incorporates by reference each allegation contained in the preceding paragraphs as if set forth herein.

149. A copyright notice, the name of the author, and the terms and conditions for use of a work are each copyright management information within the meaning of 17 U.S.C. § 1202(c).

150. BCUHB violated 17 U.S.C. § 1202(a) by conveying and distributing copyright management information that it knew to be false: it published, beneath each of the three figures reproducing the questionnaire, a statement that the reproduced work was licensed under the terms of the Creative Commons Attribution 4.0 License. That statement was false, and the reproduced instrument was not available under any Creative Commons license.

151. BCUHB further violated 17 U.S.C. § 1202(a) by attributing to Morisky et al. 2008 a scoring regime that is not found in that source and that departs from the validated method.

152. BCUHB violated 17 U.S.C. § 1202(b) by intentionally removing the copyright notice borne by the instrument itself — "Copyright 2006 Donald E. Morisky. All rights reserved" — and by removing the attribution footnote the instrument requires on the first table or figure presenting it, and by thereafter distributing the work knowing that the copyright management information had been removed. See Exhibit 15.

153. On information and belief BCUHB acted knowingly, and with the intent to induce, enable, facilitate, or conceal infringement. The false notice invited every reader of the article, and every downstream author, to reproduce the instrument in reliance on an open license that did not exist.

154. The falsity of the notice is confirmed by the authors' own subsequent conduct: they requested retraction of the Accused Article on the ground that the scale had been used without the necessary permissions. See Exhibit 16.

155. Plaintiff is entitled to actual damages and profits, or in the alternative to statutory damages under 17 U.S.C. § 1203(c)(3)(B), together with costs and attorneys' fees under 17 U.S.C. § 1203(b)(4) and (5), and to injunctive relief under 17 U.S.C. § 1203(b)(1).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment in its favor and against Defendants as follows:

A. For actual damages according to proof at trial against MSU and BCUHB, and for any additional profits of MSU and BCUHB attributable to the acts complained of;

B. For statutory damages against BCUHB for willful copyright infringement under 17 U.S.C. § 504(c), and for statutory damages under 17 U.S.C. § 1203(c)(3)(B);

C. For exemplary damages against MSU under 18 U.S.C. § 1836(b)(3)(C) and Cal. Civ. Code § 3426.3(c);

D. For a preliminary and permanent injunction requiring Defendant Adesuwa Olomu, M.D., in her official capacity as Responsible Party, to submit an amended record for ClinicalTrials.gov Study NCT04874116 removing or correcting the specification of the eight-item Morisky instrument quoted in this Complaint;

E. For preliminary and permanent injunctive relief restraining Defendants MSU and BCUHB and all persons in active concert with them from further use, reproduction, distribution, or publication of the Morisky Widget, the GMRF, and the licensed instrument and its scoring and coding criteria, absent a license;

F. For an order that Defendants file with the Court and serve upon Plaintiff, within thirty days after service of an injunction, a report under oath setting forth the manner of compliance;

G. For costs of suit incurred;

H. For attorneys' fees as provided by 17 U.S.C. § 505, 17 U.S.C. § 1203(b)(5), 18 U.S.C. § 1836(b)(3)(D), and Cal. Civ. Code § 3426.4;

I. For prejudgment interest at the maximum rate allowed by law; and

J. For such other and further relief as the Court deems just and proper.

Respectfully submitted,

**HANKIN PATENT LAW, APC**

Dated: September 11, 2026 By: /Marc E. Hankin/

Marc E. Hankin, Esq.
Attorneys for Plaintiff,
**MMAS RESEARCH LLC**

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury of all issues so triable in this action.

**HANKIN PATENT LAW, APC**

Dated: September 11, 2026 By: /Marc E. Hankin/

Marc E. Hankin, Esq.
Attorneys for Plaintiff,
**MMAS RESEARCH LLC**